IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMPSON STREET CAPITAL PARTNERS IV, L.P., in its CAPACITY as MEMBERS' REPRESENTATIVE, | § § § § § § § | |
| Plaintiff Below, Appellant, | § § § | No. 166, 2024 |
| v. | § § § | Court Below: Court of Chancery of the State of Delaware |
| SONOVA UNITED STATES HEARING INSTRUMENTS, LLC, | § § § § | C.A. No. 2023-0922 |
| Defendant Below, Appellee. | § § § | |

Submitted: February 19, 2025
Decided:    April 28, 2025

Before **VALIHURA**, **TRAYNOR**, and **GRIFFITHS**, Justices.

Upon appeal from the Court of Chancery.  **REVERSED** and **REMANDED.**

Steven T. Margolin, Esquire (*argued*), Bryan T. Reed, Esquire, GREENBERG TRAURIG, LLP, Wilmington, DE, *for Appellant Thompson Street Capital Partners IV, L.P., in its Capacity As Members' Representative*.

D. McKinley Measley, Esquire, Alec F. Hoeschel, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE, *for Appellee Sonova United States Hearing Instruments, LLC*.

W. Brantley Phillips, Jr., Esquire (*argued*), Joseph B. Crace, Esquire, Margaret V. Dodson, Esquire, BASS, BERRY & SIMS PLC, Nashville, TN, *Of Counsel for Appellee Sonova United States Hearing Instruments, LLC*.

**VALIHURA**, Justice:

Delaware is a contractarian state, but our common law abhors a forfeiture. This case requires us to interpret a unitary contractual scheme composed of a merger agreement and escrow agreement entered into by Sonova and Thompson. The merger agreement required Sonova to meet timing and specificity requirements when filing a claim notice for indemnification. The final sentence of Section 9.3.2(a) (the "Final Sentence") of the Merger Agreement's notice provision clearly and unambiguously conditioned Sonova's right to recover on submission of a claim notice. It reads: "[Sonova] shall have no right to recover any amounts pursuant to Section 9.2 unless the Purchaser notifies the Members' Representative in writing of such Claim pursuant to Section 9.3 on or before the Survival Date."[1] The Final Sentence also provides for a potential forfeiture of Sonova's indemnification rights by stating that Sonova "*shall have no right to recover*" these funds unless it notified Thompson "in writing of such Claim pursuant to Section 9.3[.]"

We hold that the Final Sentence clearly embodies a condition precedent and potential for forfeiture because it states plainly that there is no right to indemnification unless the claim notice is provided. However, because our law abhors a forfeiture, Sonova's noncompliance may be excused if the timing and specificity requirements were not material to the agreement and the noncompliance would result in a disproportionate forfeiture. Because the facts relating to materiality and disproportionate forfeiture are not sufficiently developed in the record, we **REVERSE** the Court of Chancery's order granting

---

[1] App. to Opening Br. at A036 (Merger Agreement § 9.3.2(a)) (underlines in original).

dismissal of the complaint and **REMAND** for further development on these points consistent with this opinion.

## I. RELEVANT BACKGROUND

### A. The Parties

Plaintiff Below/Appellant, Thompson Street Capital Partners IV, L.P., ("Thompson") is a "Delaware limited partnership acting in its capacity as the Members' Representative (as defined in the parties' Merger Agreement) for those former members of Alpaca Group Holdings, LLC, a Delaware limited liability company ('Alpaca')."[2] Defendant Below/Appellee, Sonova United States Hearing Instruments, LLC, ("Sonova") is a Delaware limited liability company.

### B. The Transactions

In 2022, the parties engaged in multiple transactions through which Sonova acquired certain audiology practices operated by Alpaca and its subsidiaries. These audiology practices – referred to in the Merger Agreement as "Practice Entities" – included entities domiciled in several states.[3] On January 13, 2022, the Merger Agreement was entered into by Sonova, Wave Merger Sub 1, Inc., a Delaware corporation ('Merger Sub 1'), Waver Merger Sub 2, LLC, a Delaware limited liability company ('Merger Sub 2'), Alpaca Group Holdings, LLC, a Delaware limited liability company ('Alpaca'), Alpaca

---

[2] *Id.* at A014 (Verified Complaint [hereinafter: Compl.] ¶ 3).

[3] App. at A062 (Merger Agreement Annex I).

3

Blocker Corp., a Delaware business corporation ('Blocker') and Plaintiff (who was referred to in the Merger Agreement as 'Members' Representative').

These transactions were governed by two integrated agreements: a Merger Agreement and an Escrow Agreement. The agreements governed the process by which Sonova could submit claims to recover alleged damages from the Indemnity Escrow Fund in the event of alleged breach by Thompson. As part of this process, Sonova was required to comply with the notice requirements in the merger agreement, including, among others, specificity requirements in Section 9.3.2 of the merger agreement requiring Sonova to provide "all available material written evidence" of the claim.[4] The parties agreed that the escrow funds were to be the sole recovery option for Sonova.[5]

Section 9.3.2 of the Merger Agreement is entitled "Claim Procedures." It contains notice requirements for the submission of indemnification claims providing:

> Any claim by a Purchaser Indemnified Party on account of Damages under this Article IX (a "**Claim**"), including those resulting from the assertion of a claim by any Person who is not a Party to this Agreement (a "**Third-Party Claim**"), will be asserted by giving the Members' Representative reasonably prompt written notice thereof, but in any event not later than 30 days after the Purchaser Indemnified Party becomes actually aware of such Claim, provided that no delay on the part of the Purchaser Indemnified Party in notifying the Members Representative will relieve the Merger Parties from any obligation under this Article IX, except to the extent such delay actually and materially prejudices the Merger Party. Such notice by the Purchaser

---

[4] *Id.* at A036 (Merger Agreement § 9.3.2(a)).

[5] *Id.* at A037 (Merger Agreement § 9.3(c)); *see also id.* at A108 ([Sonova's] Opening Br. in Support of its Motion to Dismiss dated Nov. 29, 2023, at 6) ("Sonova's recovery for any indemnity-related damages is limited to an Indemnity Escrow Fund."); *id.* at A210 (Transcript of Oral Argument at 16:23–25, *Thompson Street Capital P'rs, IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2024 WL 1251150 (Del. Ch. Mar. 25, 2024) (No. 2023-0922)) (Thompson: "Section 9.4 makes clear that the indemnity fund is the exclusive source for certain claims, like the claim that is in the claim notice[.]").

Indemnified Party will describe the Claim in *reasonable detail*, will include the justification for the demand under this Agreement with *reasonable specificity*, will *include copies of all available material written evidence thereof*, and will *indicate the estimated amount*, if reasonably practicable, of Damages that has been or may be sustained by the Purchaser Indemnified Party. **The Purchaser Indemnified Parties *shall have no right to recover any amounts pursuant to Section 9.2 unless the Purchaser notifies the Members' Representative in writing of such Claim pursuant to Section 9.3* on or before the Survival Date.**[6]

We will refer to the above requirements for specificity and timing as the "Notice Requirements."

The Final Sentence in Section 9.3.2(a) of the Merger Agreement – in bold above – is the focus of this appeal. The parties also highlighted two other provisions of the Merger Agreement.

The first is the Merger Agreement's No-Waiver Provision in Section 11.2.2, entitled "Amendments and Waivers," which states:

No failure or delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.[7]

The second is the Merger Agreement's Integration Clause in Section 11.13 which states that "[t]his Agreement (including the Schedules and Annexes) and the Ancillary Agreements (including any schedules and annexes to the Ancillary Agreements) constitute the complete, integrated agreement among the Parties with respect to the subject matter of

---

[6] *Id.* at A036 (Merger Agreement § 9.3.2(a)) (italics and bold in final sentence added) (other bold and underlines in original).

[7] *Id.* at A040 (Merger Agreement § 11.2.2).

this Agreement and such Ancillary Agreements."[8]   The Merger Agreement defines "Ancillary Agreements" as "the Escrow Agreement" in the Definitions Annex.[9]  Thus, the Merger Agreement and Escrow Agreement constitute an integrated agreement.[10]

Pursuant to the Escrow Agreement, the parties established the Escrow Fund "made up of two distinct dollar amounts, each maintained in a separate account with the Escrow Agent:   (1) the Adjustment Escrow, in an amount equal to $750,000.00; and (2) the Indemnity Escrow, in an amount equal to $7,750,000.00."[11]  "[T]he Adjustment Escrow was released in the Fall of 2022 following the parties' resolution of alleged issues related to the Preliminary Adjustment Statement delivered at the closing of the Merger Agreement[]" but "[t]he Indemnity Escrow Fund remained in place, pending its release as required by the Escrow Agreement."[12]

The Escrow Agreement contains provisions for the release of the Indemnity Escrow Fund.  One of these, Section 3(a)(i), provides as follows:

> The Indemnity Escrow Fund shall be released from the Indemnity Escrow Account (i) on August 29, 2023 (the "Indemnity Escrow Expiration") in accordance with a written notice from both Parties in the form of Exhibit A-1 (a "Joint Instruction") to the extent that the balance of the Indemnity Escrow Account is greater than the aggregate amount of all Claim Reserves (as defined below) for all then Open Claims (if any), (ii) from time to time in accordance with a Joint Instruction delivered not less than two (2) Business Days prior to the requested disbursement date, or (iii) from time to time in accordance with a written instruction from either Party given to

---

[8] *Id.* at A045 (Merger Agreement § 11.13).

[9] *Id.* at A051 (Merger Agreement Annex I).

[10] Parties do not dispute this.  Answering Br. at 19–20; Opening Br. at 36–37.

[11] App. to Opening Br. at A017 (Compl. ¶ 14); *see also id.* at A072 (Escrow Agreement).

[12] *Id.* at A017 (Compl. ¶ 15).

effectuate an attached copy of a final non-appealable binding order or judgment or award from a court or other arbiter of competent jurisdiction and authority; _provided_, that such award from a court or arbiter appointed by the Parties is accompanied by (A) a written certification from counsel for the applicable Party stating that such order, judgment or award is final and not subject to further proceedings or appeal and (B) the written payment instructions of the prevailing Party and executed by an Authorized Representative of the prevailing Party to effectuate such order, judgment or award (each of immediately preceding clauses (ii) and (iii), a "<u>Final Indemnification Determination</u>"). The prevailing Party shall simultaneously provide a copy of any Final Indemnification Determination, certification and written instruction to the other Party. Escrow Agent shall be entitled to conclusively rely upon any such certification and instruction and shall have no responsibility to review the Final Indemnification Determination to which such certification and instruction refers or to make any determination as to whether such Final Indemnification Determination is final.[13]

Section 3(a)(ii) of the Escrow Agreement establishes procedures governing the submission of a claim, including the submission of a Claim Notice. It provides as follows:

From time to time following execution of this Agreement and on or prior to 5:00 p.m. New York City time on the Indemnity Escrow Expiration, if Purchaser determines in good faith that it or any Purchaser Indemnified Person has a claim to a payment from the Indemnity Escrow Fund pursuant to <u>Article IX</u> of the Merger Agreement (a "<u>Claim</u>"), then Purchaser may provide written notice of the Claim on behalf of itself or any Purchaser Indemnified Person, to the Escrow Agent with a copy sent contemporaneously to Representative (a "<u>Claim Notice</u>"). The Claim Notice shall specify in reasonable detail the nature and dollar amount of the Claim and certify that Purchaser has delivered a copy of such Claim Notice to Representative and the information set forth in such Claim Notice complies with the terms of the Merger Agreement, upon which certification the Escrow Agent shall conclusively rely. Except as otherwise provided herein, each Claim shall be deemed to be an "<u>Open Claim</u>" and the Escrow Agent shall reserve within the Indemnity Escrow Account an amount equal to the amount of such Open Claim (such reserved amount, the "<u>Claim Reserve</u>").[14]

---

[13] _Id._ at A073 (Escrow Agreement § 3(a)(i)) (emphasis and underlines in original).

[14] _Id._ (Escrow Agreement § 3(a)(ii)) (underlines in original).

On February 28, 2022, following the merger, the Escrow Fund in an amount equal to $8,500,000, was deposited with the Escrow Agent pursuant to the terms of the Escrow Agreement.

## C. Sonova Delivers an "Indemnification Claim Notice"

On August 25, 2023 – one business day before the Indemnity Escrow Expiration date – Sonova delivered what it referred to as an "Indemnification Claim Notice" to Thompson and the Escrow Agent (the "Claim Notice").[15] The Claim Notice stated that it was being provided in accordance with the applicable terms of the Merger Agreement, and it included the following language:

> In accordance with the terms of the Merger Agreement, including Section 9.3.2, Purchaser hereby provides written notice to Members' Representative of a Claim for indemnification pursuant to the terms of the Merger Agreement. This letter is also a Claim Notice to the Members' Representative and the Escrow Agent in accordance with the terms of the Escrow Agreement, including Section 3(a)(ii). This Claim Notice complies with the applicable terms of the Merger Agreement.[16]

The Claim Notice alleged improper billing practices that led to Sonova incurring unquantified damages:

> Purchaser has become aware of certain billing practices of the Company, its Subsidiaries and the Practice Entities that Purchaser believes are not in compliance with applicable Laws and/or third-party payor reimbursement rules or other requirements. Specifically, Purchaser believes certain items and/or services provided by the Company, its Subsidiaries and the Practice Entities to patients in multiple states (including without limitation Arkansas, Michigan, New Jersey and Tennessee) were improperly billed under the names and billing numbers of clinicians who did not personally provide the items and/or services to those patients. As a result of those billing practices,

---

[15] *Id.* at A018 (Compl. ¶ 18); *see also id.* at A093–094 (Claim Notice).

[16] *Id.* at A093 (Claim Notice).

Purchaser believes the Company, its Subsidiaries and the Practice Entities have billed and received payment or reimbursement to which they are not entitled under applicable Laws and/or third-party payor reimbursement rules and other requirements. The improper billing and receipt of payment or reimbursement to which they are not entitled constitute breaches of the representations and warranties of the Company contained in Sections 3.8, 3.11, and 3.21 of the Merger Agreement. Pursuant to Section 9.2 of the Merger Agreement, the Merger Participants agreed to indemnify and hold harmless Purchaser from, against and in respect of any Damages resulting from breaches of the representations and warranties contained in the Merger Agreement.[17]

Finally, Sonova's Claim Notice alleged that the unquantified amount of damages exceeded the Indemnity Escrow Fund, and the Claim Notice directed the Escrow Agent to establish a Claim Reserve in the full amount of the Indemnity Escrow Fund:

> As of this date, Purchaser's investigation and analysis of these matters is continuing, and the aggregate amount of Damages relating to the Claim is not known or estimable with certainty. Based upon Purchaser's investigation and analysis to date, Purchaser's maximum Damages relating to the Claim are in excess of the Indemnity Escrow Fund. Purchaser will supplement this Claim and Claim Notice as reasonably necessary as Purchaser learns additional information and concludes its investigation and analysis. Escrow Agent is hereby directed to establish a Claim Reserve in the full amount of the Indemnity Escrow Fund.[18]

### D. Proceedings Below

On September 11, 2023, Thompson filed a Verified Complaint ("Complaint") in the Court of Chancery. The Complaint contained two counts – Count I "Declaratory Judgment," and Count II "Specific Performance / Mandatory Injunction." In its Prayer for

---

[17] *Id.* at A093–094 (Claim Notice).

[18] *Id.* at A094 (Claim Notice). The Claim Notice also stated that "[p]rovision of this Claim and Claim Notice is without waiver of any other of Purchaser's rights under the Merger Agreement, the Escrow Agreement and any other applicable agreements, all of which are expressly reserved." *Id.*

9

Relief, Thompson sought an order declaring that the Purported Claim Notice did not meet the contractual requirements with which Sonova had to comply and, as such, could not serve as a basis to withhold the escrowed funds. Thompson also sought a mandatory injunction requiring Sonova to execute a Joint Instruction letter directing the Escrow Agent to release the contents of the Indemnity Escrow Fund to Plaintiff.

Sonova moved to dismiss the Complaint. Relevant here, Sonova argued that Thompson's Complaint failed to plead a claim for relief that Sonova's Claim Notice did not comply with the Merger Agreement.[19] Sonova acknowledged the primacy of the Merger Agreement stating: "Merger agreement Section 9.3.2(a) governs the process by which Sonova notifies Plaintiff of any indemnification claims."[20] Sonova then argued that "Section 9.3.2 [of the Merger Agreement] requires only that Sonova serve a written claim notice on or before the Survival Date in order to preserve a claim for indemnification and prevent the release of the Indemnity Escrow Fund."[21]

Sonova argued further that its Claim Notice was timely, that Thompson did not plead any specific prejudice or harm due to the timing of the Claim Notice, and that the Claim Notice provided Thompson with reasonable notice of its claim. It argued that it had complied with all the Notice Requirements but that some of the information Thompson sought was unavailable.[22] Sonova's Claim Notice states that it is being submitted "*in*

---

[19] *Id.* at A111 (Motion to Dismiss Opening Br. at 9).

[20] *Id*. at A107 (Motion to Dismiss Opening Br. at 5).

[21] *Id.* at A112 (Motion to Dismiss Opening Br. at 10) (capitalization in heading removed).

[22] *See id.* at A120 (Motion to Dismiss Opening Br. at 18 n.6) ("Any 'requirement' in the Merger Agreement that Sonova provide 'written evidence' is qualified by the term 'available.'"). Sonova

*accordance with* the terms of the Merger Agreement, including Section 9.3.2."[23]  Sonova argued that the requirements in Section 9.3.2 did not contemplate the level of detail Thompson was seeking.[24]  Counsel for both sides agreed at the hearing below that the specificity (or "particularity") requirements were part of Section 9.3.2's notice

argued that "due to the status of the investigation, as well as the sensitive nature of any supporting documentation, any evidence would not be 'available' to attach to a Notice of Indemnification." *Id.*

[23] *See id.* at A093 (Claim Notice) (emphasis added).  At oral argument before this Court, when Thompson was asked what the phrase "pursuant to" meant, it argued that "pursuant to Section 9.3" means that Sonova must provide notice "in accordance with" Section 9.3 – including the Notice Requirements in Section 9.3.2.  Oral Argument Video 9:52–11:08.  Sonova did not respond to Thompson's "in accordance with" interpretation of "pursuant to."  Thus, the parties seemed to agree that "pursuant to" meant "in accordance with."  We note that some commentators have recommended alternative language such as "in accordance with" instead of "pursuant to." *See Pursuant to*, Garner's Modern English Usage (5th ed. 2022) (stating that the term is "multihued" and "is rarely – if ever – useful.  Lawyers are the main users of the phrase and they have used it only since about 1800 – often imprecisely."); Kenneth A. Adams, *ABA Manual of Style for Contract Drafting* 547–48 (2023 ed.) (describing "pursuant to" as a "wordy phrase" and recommending instead "under," "in accordance with," or "authorized by.").  No party in this case has argued that "pursuant to," as used in the Final Sentence, is unclear. *See infra* n. 114.  Although other language might have been preferable, we think the meaning as used here is clear.

[24] *See*, *e.g.*, App. to Opening Br. at A117 (Motion to Dismiss Opening Br. at 15–16) ("While Plaintiff may, *ex post*, desire additional information in the Claim Notice beyond what is required in the Merger Agreement – including, for example, information regarding specific providers, contracts, third-party payors, or specific laws at issue (*see* Compl. ¶ 28) – the parties' agreements do not require such information."); *see also id.* at A203 (Transcript of Oral Argument at 9:1–25, *Thompson Street Capital P'rs, IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2024 WL 1251150 (Del. Ch. Mar. 5, 2024) (No. 2023-0922)) (Sonova: "For context, the notice provision [expressly referring to Section 9.3.2] requires Sonova to do a few things:  'Describe the complaint in reasonable detail.'  'Include the justification for the demand under this agreement with reasonable specificity.'  'Include copies of all available material written evidence thereof.  And, 'Include the estimated amount, if reasonably practical, of damages.'  That's in Section 9.3.2 of the Merger Agreement.  Sonova claimed that it has complied with all these requirements.  It alerted plaintiff that Sonova has uncovered problems in certain specified states where they improperly billed claims using the credentials of providers who were not personally involved in the patient care issue.  It listed the specific provisions of the Merger Agreement that they breached as a result of these problems.  It also stated that our investigation of these problems was ongoing and that a reasonable estimate of damages was not yet available.  It made clear, however, that the damages likely would exceed the amount of the remaining indemnity escrow claims.").

requirements.[25]  Further, Sonova argued that even assuming, *arguendo*, that the Claim Notice was substantively deficient, the Merger Agreement did not permit the remedy that Thompson sought.  Sonova argued that "the Merger Agreement does not permit Plaintiff to have a timely Claim Notice declared 'invalid on its face' because Plaintiff subjectively believes the substantive content to be inadequate."[26]

*E. The Court of Chancery's Analysis*

On March 25, 2024, the Court of Chancery issued a "Letter Opinion"[27] and addressed "whether Thompson Street is entitled to a release of the Indemnity Escrow Fund on the basis that the Notice sent to the escrow agent was invalid."[28]  It held that "the Notice was valid for the purpose of stopping a release of the Indemnity Escrow Fund."[29]

The court focused on the timeliness and specificity of the Claim Notice and analyzed Sonova's compliance through the lens of the Escrow Agreement.  Regarding timeliness, the court held that the Claim Notice was timely under the Escrow Agreement since the Escrow Agreement deadline was August 29, 2023 and Sonova sent the Claim Notice on August 25, 2023.  The court also analyzed Sonova's timeliness compliance under the

---

[25] *See id.* at A212 (Transcript of Oral Argument at 18:9–13, *Thompson Street Capital P'rs, IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2024 WL 1251150 (Del. Ch. Mar. 5, 2024) (No. 2023-0922)).

[26] *Id.* at A120 (Motion to Dismiss Opening Br. at 18).  Sonova also argued that:  (i) "Count II should be dismissed, as it merely asserts remedies and not causes of action that stand alone under Delaware law[],"*id.* at A124 (Motion to Dismiss Opening Br. at 22); and (ii) that Thompson failed to plead entitlement to mandatory injunctive relief or specific performance. *Id*.

[27] *Thompson Street Cap. P'rs, IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 2024 WL 1251150, at *1 n.1 (Del. Ch. Mar. 25, 2024).

[28] *Id.* at *3.

[29] *Id.*

12

Merger Agreement "[f]or thoroughness[.]"[30] The court rejected Thompson's argument that the Claim Notice was untimely because it was not within 30 days of Sonova becoming aware of the claim. The court explained that "even if Sonova had knowledge of the underlying facts to trigger the 30-day notice requirement, Thompson Street hasn't pled the actual and material prejudice needed to deem the notice untimely under Section 9.3.2(a) of the Merger Agreement."[31] The court rejected Thompson's statements about prejudice as vague, conclusory, and unsupported by the facts.

Regarding specificity, the court observed that "Section 3(a)(ii) of the Escrow Agreement tracks Section 9.3.2 of the Merger Agreement."[32] But rather than applying the Notice Requirements of Section 9.3.2, which the parties seemed to agree governed, the court analyzed Sonova's compliance through the lens of the Escrow Agreement stating that "Section 3(a)(ii) [of the Escrow Agreement], on the other hand, requires that the notice 'specify in reasonable detail the nature and dollar amount of the Claim.'"[33] The court held that Sonova had provided adequate specificity reasoning that:

> Section 3(a)(ii) does not require Sonova to present every minute detail or prove the merits of its claims. Indeed, Section 3(a)(ii) does not require production of all available written evidence. Consistent with its limited scope and purpose, the Notice need only give notice to the escrow agent of Sonova's pending indemnification claims. It does just that. Count I will be dismissed.[34]

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at *5. The court did not analyze whether Sonova's Claim Notice complied with the Specificity Requirements of the Notice Requirements in Section 9.3.2 of the Merger Agreement.

13

The court granted Sonova's Motion to Dismiss after concluding that "[t]he notice provisions at issue here are unambiguous and Thompson Street's prayers for relief are fatally lacking."[35]

## II. CONTENTIONS ON APPEAL

Thompson argues that "[r]eversal is required because: (a) the Complaint's pleading more than satisfied Rule 12's lenient standard; and (b) the lower court ignored the Merger Agreement provision that Defendant-below admitted was controlling on the determinative legal issue presented."[36] More specifically, Thompson argues that Sonova's noncompliance with Section 9.3.2 is reasonably conceivable because Sonova failed to comply with requirements for documentation, specificity and calculation, and timely assertion.

Thompson's argument on appeal is anchored on its premise that the Letter Decision examined the wrong contract, namely the Escrow Agreement. It contends that the court erred in holding that "the Escrow Agreement's internal notice clause – which simply stated what Sonova had to tell the Escrow Agent – somehow governed this case to the exclusion of Section 9.3.2 and Sonova's related obligations to Plaintiff under the Merger Agreement."[37]

---

[35] *Id.* The court next addressed Count II and concluded that "[b]oth because a request for specific performance is a remedy, and not a standalone claim, and because that remedy is tied the Count I's viability, Count II will be dismissed." *Id.*

[36] Opening Br. at 2.

[37] *Id.* at 34.

14

Sonova advances a four-pronged argument that the Court of Chancery correctly held that its Claim Notice was sufficient to stop release of the Indemnity Escrow Fund:[38] (i) "[t]he Court of Chancery correctly found that the Escrow Agreement controls the release of the Indemnity Escrow Fund[;]"[39] (ii) "[t]he Court of Chancery correctly found that [Thompson] failed to plead facts demonstrating that Sonova's Claim Notice was untimely under either the Escrow Agreement or the Merger Agreement[;]"[40] (iii) "[t]he Court of Chancery correctly found that Sonova's Claim Notice was sufficiently specific for purposes of the Escrow Agreement[;]"[41] and (iv) "[Thompson] has failed to state a claim."[42]

In addition, Sonova argues that the Merger Agreement's Notice Requirements were not conditions precedent to relief, that Thompson has not alleged any credible prejudice resulting from Sonova's alleged noncompliance with the Claim Notice's substantive contents, and that Thompson's arguments ignore the Merger Agreement's No-Waiver provision in Section 11.2.2.

## III. STANDARD OF REVIEW

"In reviewing the dismissal of a complaint under Rule 12(b)(6), the standard of appellate review is *de novo*."[43] "This Court, like the trial court, 'must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to

---

[38] Answering Br. at 17.

[39] *Id.* at 18 (capitalization removed).

[40] *Id.* at 23 (capitalization removed).

[41] *Id.* at 25 (capitalization removed).

[42] *Id.* at 26 (capitalization removed).

[43] *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (italics added).

15

support the claims asserted, the plaintiffs would not be entitled to relief.'"[44] "That determination by this Court, as in the trial court, is generally limited to the factual allegations contained in the complaint."[45] "When reviewing a Rule 12(b)(6) motion, a trial court must accept as true all of the well-pleaded allegations of fact, but is not required to accept as true conclusory allegations without specific supporting factual allegations."[46] "Dismissal is appropriate when the defendant's interpretation is the only reasonable construction as a matter of law and that construction reveals that the plaintiff cannot sustain an actionable claim."[47]

"[T]his Court 'review[s] questions of contract interpretation *de novo*.'"[48] "Moreover, 'whether a contract is unambiguous is a question of law[.]'"[49] "The existence of a condition precedent is a question of contract interpretation, and therefore, of law."[50]

---

[44] *Id.* (quoting *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993)).

[45] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

[46] *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022) (internal quotations omitted).

[47] *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2024 WL 3580827, at *9 (Del. Ch. July 29, 2024) (citation omitted).

[48] *Coronado Coal II, LLC v. Blackhawk Land and Resources, LLC*, 293 A.3d 372, 2023 WL 2339583, at *3 (Del. Mar. 2, 2023) (TABLE) (quoting *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014)).

[49] *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024) (quoting *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847, 847 n.68 (Del. 2019)).

[50] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021) (citing *Casey Emp. Servs., Inc. v. Dali*, 634 A.2d 938, 1993 WL 478088, at *4 (Del. Nov. 18, 1993) (TABLE)).

*IV.  ANALYSIS*

To recap, we consider whether the court below adequately focused on the Merger Agreement's Notice Requirements, whether the Final Sentence of Section 9.3.2(a) contains a condition precedent capable of triggering a forfeiture for Sonova's noncompliance with the Notice Requirements, whether Sonova's noncompliance with the Notice Requirements is reasonably conceivable on the record, and, if so, whether Sonova's noncompliance may be excused.  We hold that:  (i) the court below did not adequately focus on the Merger Agreement's Notice Requirements; (ii) the Final Sentence of Section 9.3.2(a) contains a condition precedent capable of triggering a forfeiture due to Sonova's noncompliance with the Notice Requirements; (iii) Sonova's noncompliance with the Notice Requirements is reasonably conceivable on the record; and (iv) Sonova's noncompliance may be excused if it satisfies the requirements for excusal; however (v) the materiality and disproportionate forfeiture issues that factor into the excusal analysis are insufficiently developed in the record.  Therefore, we reverse and remand for further development of the materiality and, if necessary, the disproportionate-forfeiture points.

A.  *Principles of Contract Interpretation*

We begin by considering the principles of contract law that guide our analysis.

17

*1. General Principles*

"Delaware is a contractarian state that holds parties' freedom of contract in high regard."[51] "'When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language.'"[52] "[C]lear and unambiguous language is 'reasonably susceptible of *only one* interpretation.'"[53] "Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one."[54]

"A provision in a contract is ambiguous 'when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[55] "'Where no ambiguity exists, the contract will be interpreted according to the 'ordinary and usual meaning' of its terms.'"[56] "'The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.'"[57]

---

[51] *Sunder Energy, LLC v. Jackson*, – A.3d –, 2024 WL 5052887, at *9 (Del. Dec. 10, 2024); *see also Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 355 (Del. 2022) ("Delaware is a contractarian state.").

[52] *BitGo*, 319 A.3d at 322 (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

[53] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)) (emphasis added in *BitGo*).

[54] *Id.*

[55] *Id.* at 323 (quoting *Rhone-Poulenc*, 616 A.2d at 1196).

[56] *Town of Cheswold v. Cen. Delaware Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).

[57] *Manti Holdings*, 261 A.3d at 1208 (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).

"Delaware courts follow the maxim that the general does not detract from the specific."[58]  "This principle of contract interpretation dictates that 'where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.'"[59]  "This principle 'can be thought of as reading the specific as an exception to the general, which allows a harmonizing of otherwise conflicting provision[s].'"[60]  Thus, we have recognized that "general terms of the contract must yield to more specific terms."[61]

### 2. Integrated Agreements are Interpreted as a Unitary Contractual Scheme

The parties agree that the Merger and Escrow Agreements form an integrated agreement.[62]  Delaware courts have been called upon to interpret integrated agreements in previous cases.  For example, in *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, the Court of Chancery addressed a case where the parties – as in the present case – contemporaneously entered into both a merger agreement and an escrow agreement.[63]  The Court of Chancery observed that the integration clause in the merger agreement integrated

---

[58] *Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *10 (Del. Super. Aug. 31, 2023) (quotation omitted).

[59] *Id.* (quoting *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *24 (Del. Ch. July 22, 2015) (quoting *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005))).

[60] *Id.* (quoting *CSH Theatres, LLC v. Nederlander of San Francisco Assoc.*, 2018 WL 3646817, at *24 (Del. Ch. July 31, 2018) *aff'd in part, rev'd in part*, *In re Shorenstein Hays-Nederlander Theatres LLC*, 213 A.3d 39 (Del. 2019)).

[61] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (citing *DCV*, 889 A.2d at 961); *see also DCV*, 889 A.2d at 961 ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[62] Answering Br. at 19–20, Opening Br. at 35.

[63] *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2024 WL 3580827, at *9–10 (Del. Ch. July 29, 2024).

19

the escrow agreement by referencing "ancillary agreements" and expressly defining "ancillary agreements" to include the "escrow agreement."[64] The court concluded that "the Merger Agreement and Escrow Agreement should be read together as a unitary contractual scheme."[65] Similarly here, the Merger Agreement contains a clause integrating "Ancillary Agreements" and defines "Ancillary Agreements" to include the "Escrow Agreement."[66] Accordingly, the Merger Agreement and Escrow Agreement are integrated and we read them as a unitary contractual scheme.

### 3. Contracts Will Be Interpreted to Give Each Provision and Term Effect and Not Render Any Terms Meaningless or Illusory

"'In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.'"[67] "'[A] court interpreting any contractual provision ... must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.'"[68] This is consistent with "'the principle of contract interpretation that requires this court to interpret the various

---

[64] *Id.* at *9.

[65] *Id.* (internal quotation omitted).

[66] App. to Opening Br. at A045 (Merger Agreement § 11.13); *id.* at A051 (Merger Agreement Annex I). The parties do not dispute this interpretation. Answering Br. at 19–20, Opening Br. at 35-37.

[67] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2022) (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[68] *Id.* (quoting *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998)).

provisions of a contract harmoniously.'"[69] Accordingly, "[c]ontracts will be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'"[70]

### 4. Language Creating Conditions Precedent

The parties here dispute whether the language used in the Final Sentence of Section 9.3.2(a) creates a condition precedent that includes the Notice Requirements in Section 9.3.2. "A condition precedent is 'an act or event, other than a lapse of time, that must exist or occur *before* a duty to perform something promised arises.'"[71] "Although '[t]here are no particular words that must be used to create a condition precedent,' a condition precedent must be expressed clearly and unambiguously."[72] The non-occurrence of a condition precedent may be capable of triggering a forfeiture.[73] "A forfeiture is generally

---

[69] *Fortis*, 2024 WL 3580827, at *9 (quoting *Menn v. ConMed Corp.*, 2022 WL 2387802, at *38 (Del. Ch. June 30, 2022)).

[70] *Manti*, 261 A.3d at 1208 (quoting *Osborn*, 991 A.2d at 1159).

[71] *Aveanna,* 2021 WL 3235739, at *25 (quoting *Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Sept. 22, 2020)) (emphasis added in *Aveanna*); *Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994) ("a condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises."); *see also* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.").

[72] *Aveanna*, 2021 WL 3235739, at *25 (quoting *Thomas*, 2020 WL 5946962, at *5).

[73] Restatement (Second) of Contracts § 227 cmt.b ("The non-occurrence of a condition of an obligor's duty may cause the obligee to lose his right to the agreed exchange after he has relied substantially on the expectation of that exchange, as by preparation or performance. The word 'forfeiture' is used in this Restatement to refer to the denial of compensation that results in such a case.").

understood as a deprivation of rights or property as a result of the nonperformance of some obligation or condition."[74]

Thompson argues that Sonova's alleged failure to comply with Section 9.3.2 "effects an enforceable waiver/forfeiture of Sonova's ability to seek indemnification."[75]  If Thompson is correct, Sonova would be unable – absent excusal of the condition – to pursue recovery of up to $7,750,000 from the Indemnity Escrow Fund because the Merger Agreement states that "[t]he Indemnity Escrow Fund shall be the [Sonova's] sole and exclusive source of recovery for Damages under this Agreement[.]"[76]

Conditions precedent that trigger forfeitures create a tension in contract law.  On the one hand, "Delaware is a contractarian state that holds parties' freedom of contract in high regard."[77]  On the other hand, our common law generally disfavors forfeitures.[78]

This tension has led Delaware courts to look to whether the language clearly provides for a forfeiture.  "If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one."[79]  If the language clearly provides

---

[74] *Nw. Cent. Pipeline Corp. v. Mesa Petroleum Co.*, 1985 WL 44696, at *4 (Del. Ch. Apr. 10, 1985); *see also Forfeiture*, Black's Law Dictionary (11th ed. 2019) ("A destruction or deprivation of some estate or right because of the failure to perform some contractual obligation or condition.").

[75] Opening Br. at 22.

[76] App. to Opening Br. at A036 (Merger Agreement § 9.3(c)).

[77] *Sunder Energy,* 2024 WL 5052887, at *9; *see also Stream TV Networks*, 279 A.3d at 355 ("Delaware is a contractarian state.").

[78] *See Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 692 (Del. 2024).

[79] *QC Holdings, Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018). However, "'[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.'  And they will not relieve sophisticated parties of contracts they willingly accepted." *Seaworld Entm't, Inc. v. Andrews*, 2023 WL 3563047, at *7 (Del. Ch. May

for a forfeiture, then a court may consider whether compliance with the condition may be excused in accordance with the criteria discussed below.[80]

### 5. *Excuse of a Condition to Avoid Forfeiture*

Delaware courts have often looked to the Restatement (Second) of Contracts as persuasive authority for interpreting basic contract principles including, among other things, conditions precedent.[81] Relevant here is the Restatement's position that "the Court may excuse the nonoccurrence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreed Exchange."[82] The Restatement indicates that "[t]he rule stated in the present Section is, of necessity, a flexible one, and its application is within the sound discretion of the court."[83] "In determining whether the

---

[80] 19, 2023) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Mororists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)), *aff'd*, 314 A.3d 662, 2024 WL 650179 (Del. 2024) (TABLE); *see also Soleimani v. Hakkak*, 2024 WL 1593923, at *10 (Del. Ch. Apr. 12, 2024), *aff'd*, 327 A.3d 1060, 2024 WL 4235006 (Del. 2024) (TABLE) (internal quotations omitted) ("[I]t is not this court's job to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently. Parties have a right to enter into good and bad contracts, the law enforces both.").

[80] *See Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1221–22 (Pa. Super. Ct. 1994); *Ewell v. Those Certain Underwriters of Lloyd's, London*, 2010 WL 3447570, at *6–7 (Del. Super. Aug. 27, 2010).

[81] "Delaware trial courts have followed the Restatement of Contracts when analyzing issues related to conditions precedent[]" and "[t]he Supreme Court likewise has looked to the Restatement of Contracts for guidance on conditions precedent." *Aveanna*, 2021 WL 3235739, at *25 n.241 (citing *inter alia*, *S'holder Rep. Servs. LLC v. Shire US Holdings, Inc.*, 2020 WL 6018738, at *18–19 (Del. Ch. Oct. 12, 2020); *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12–13 (Del. Super. Apr. 2, 2003); *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 & n.34 (Del. 2017) ("*Williams II*")).

[82] *Eisenmann v. Gen. Motors Corp.*, 2000 WL 140781, at *18 n.16 (Del. Super. Jan. 28, 2000) (citing Restatement (Second) of Contracts § 229), *quoted in Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *14 (Del. Super. Aug. 31, 2023); *see also Ewell*, 2010 WL 3447570, at *6 (quoting Restatement (Second) of Contracts § 229).

[83] Restatement (Second) of Contracts § 229 cmt.b.

23

forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture."[84]

However, the scope of this principle is limited and it "applies only where occurrence of the condition was not a material part of the agreed exchange."[85] The Restatement offers the following guidance in determining whether a failure to render or to offer performance is material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[86]

---

[84] *Id.*

[85] *Id.* cmt.c.

[86] Restatement (Second) of Contracts § 241 (1981); *see also Ewell*, 2010 WL 3447570, at *6–7 (quoting materiality factors and observing that "these factors are helpful to determining materiality, but they must be tailored to fit the facts of this case."); *SLMSoft.com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *13 (Del. Super. Apr. 2, 2003) (quoting materiality factors from Restatement (Second) of Contracts § 241).

Determining whether a condition is a material part of an agreed exchange may require a fact-intensive analysis.[87] In some cases, however, a court may be able to decide materiality as a matter of law.[88] As we explain later in this opinion, some limited factual development is needed in this case.[89]

### B. The Merger Agreement and Escrow Agreement Are Integrated Meaning that Sonova Was Required to Comply with the Provisions in Both, Including the Notice Requirements

#### 1. The Merger Agreement and Escrow Agreement Are Integrated and Should Be Read As a Unitary Contractual Scheme

---

[87] *Ewell*, 2010 WL 3447570, at *7 ("These factors are helpful to determining materiality, but they must be tailored to fit the facts of this case. Delaware case law makes clear that the question of the materiality of the breach of the fire extinguisher condition is a fact question for the jury."); *see also Sahadi v. Cont'l Illinois Nat. Bank and Tr. Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983) (observing that "the determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.").

[88] *Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 (Del. Ch. Apr. 22, 2021) (addressing materiality of earnout writing that "[u]nlike horseshoes or hand grenades, there is no 'close enough' when it comes to earnouts negotiated by sophisticated parties based on the estimated probability that the *precise* measure would be hit. Any adjustment to the earnout condition, then, would be 'material' as a matter of law.") (emphasis in original); *see also Capistrant*, 916 N.W.2d at 29–30 (noting that the court had "resolved cases involving conditions precedent as a matter of law[]" but that "the record in this case does not allow resolution of the materiality question as matter of law.").

[89] *Acme*, 648 A.2d at 1221–22 (remanding due to inadequately developed record on disproportionate forfeiture and materiality); *Compare Ewell*, 2010 WL 3447570, at *6–7 (holding that "[m]aterial questions of fact exist as to the materiality of the breach" and denying summary judgment); *Nav. Techs., Inc. v. Fugate*, 2021 WL 2982065, at *8 (D. Utah July 15, 2021) (citing *Ewell* and stating that "[t]he question of whether a breach is material is a fact question for the jury."); *with Obsidian*, 2021 WL 1578201, at *8 n.76 (distinguishing *Ewell* noting that "[t]hough the 'materiality' of a condition precedent requiring a spare fire extinguisher in an attic may raise an issue of fact ill-suited for resolution on a motion to dismiss, an earnout provision is a carefully negotiated provision where the payout is expressly conditioned on the satisfaction of its precise terms.").

25

Applying the contract interpretation principles above, including those involving integrated agreements, we start with our conclusion that the Merger Agreement and Escrow Agreement should be read together as a unitary contractual scheme given that the Merger Agreement contains a provision, namely, Section 11.3, that defines "Ancillary Agreements" to include the "Escrow Agreement."[90]

### 2. Sonova Was Required to Comply With the Merger Agreement, Including the Notice Requirements of Section 9.3.2, and the Escrow Agreement

We hold that the Court of Chancery erred in focusing on the Escrow Agreement instead of the Notice Requirements in Section 9.3.2 of the Merger Agreement. Sonova argues that "the Escrow Agreement governs the release of the escrow funds, whereas the Merger Agreement governs the merits of any indemnification claim" and that this approach "reads the agreements harmoniously and as a whole, just as the parties contemplated in Merger Agreement Section 11.13."[91] We disagree because Sonova's position collides with the principle that "a contract should be interpreted in such a way as to not render any of its

---

[90] *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2024 WL 3580827, at *9 (Del. Ch. July 29, 2024) (because an integration clause provided that the merger agreement, together with the ancillary agreements -which included the escrow agreement- constituted the entire agreement, the court, applying "the principal of contract interpretation that requires this court to interpret the various provisions of a contract harmoniously," determined that the merger agreement and the escrow agreement were to be "read together as a unitary contractual scheme."); App. to Opening Br. at A045 (Merger Agreement § 11.13); *id.* at A051 (Merger Agreement Annex I).

[91] Answering Br. at 20. Sonova also argued to this Court that there are no consequences for noncompliance with the Notice Requirements. Oral Argument Video at 25:27–38, https://courts.delaware.gov/supreme/oralarguments ("The Court: My question is: if it were to be determined that the Notice did not comply, are there any consequences? Counsel: We don't believe so, Your Honor.").

26

provisions illusory or meaningless."[92]   Here, the Notice Requirements of Section 9.3.2 would be rendered meaningless if it were determined that Sonova only needed to comply with the terms of the Escrow Agreement, and not the specificity requirements in Section 9.3.2.

Section 9.3.2 sets forth specific notice requirements in addition to those in the Escrow Agreement.  A harmonious reading of the two agreements requires that the more specific requirements of Section 9.3.2 be given meaning.  Although Sonova's position has shifted somewhat on appeal, it was not seriously disputed by the parties in the proceedings below that Section 9.3.2 governed and that its specificity requirements had to be met.  The main dispute was whether they had been met or not.

The language of the Escrow Agreement also makes clear that compliance with the terms of the Merger Agreement is required.  Section 3(a)(ii) of the Escrow Agreement requires Sonova to certify that "the information set forth in such Claim Notice complies with the terms of the Merger Agreement, upon which certification the Escrow Agent shall conclusively rely."[93]   The fact that the Escrow Agreement instructs the Escrow Agent to

---

[92] *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992); *see also Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *Sonitrol*, 607 A.2d at 1183) ("We will not read a contract to render a provision or term 'meaningless or illusory.'").

[93] App. to Opening Br. at A073 (Escrow Agreement § 3(a)(ii)).  Thompson argues that Sonova acknowledged "the **Merger Agreement notice procedures are the ones that take primacy**[]" in oral argument before the Court of Chancery.  Opening Br. at 35 (emphasis in original); *see also* App. to Opening Br. at A200 (Transcript of Oral Argument at 6:17–19, *Thompson Street Capital P'rs, IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2024 WL 1251150 (Del. Ch. Mar. 5, 2024) (No. 2023-0922)).  Sonova disputes this and argues that any such statement "was premised on Sonova's underlying – and consistently stated – legal position that the operative requirements for a valid notice under the Merger Agreement and Escrow Agreement **are exactly the same**[.]" Answering Br. at 22 (emphasis in original).  Although we do not read the record that way, we need

27

conclusively rely on Sonova's certification does not change Sonova's obligation to comply with the Notice Requirements. It would make little sense for the Escrow Agreement to allow Sonova's certification of its compliance to be conclusive as to its compliance with the Notice Requirements. If that were so, Sonova could effectively determine its own compliance with a contractual term of the Merger Agreement.

Therefore, we conclude that the integrated agreements established notice requirements which included both the Notice Requirements in the Merger Agreement and the less restrictive provisions in the Escrow Agreement. The trial court erred by not requiring Sonova to comply with the Notice Requirements in Section 9.3.2 of the Merger Agreement. Whether noncompliance with the Notice Requirements can effect a forfeiture is a separate question, which we analyze next.

C. *The Final Sentence of Section 9.3.2(a) Contains a Condition Precedent Capable of Triggering a Forfeiture for Sonova's Noncompliance With the Notice Requirements*

Thompson argues that "Sonova has 'no right to recover' from the [Indemnity Escrow] Fund unless it has complied with each of Section 9.3.2's prerequisites/conditions precedent – *i.e.*, the Substantive Prerequisites and Assertion Deadline."[94] Thompson contends that Section 9.3.2 "effects an enforceable waiver/forfeiture of Sonova's ability to seek indemnification."[95] If Sonova has forfeited its ability to seek indemnification from

---

not decide the effect of Sonova's statement because we rely on the pleadings and the language in the agreements that were attached to the pleadings.

[94] Opening Br. at 16.

[95] *Id.* at 22.

the Indemnity Escrow Fund, it would be without means to recover on the claims which it asserts exceed the $7,750,000 in the Fund. This is because the Merger Agreement states that "[t]he Indemnity Escrow Fund shall be the [Sonova's] sole and exclusive source of recovery for Damages under this Agreement, other than claims for Fraud, Pre-Closing Tax Liability and breaches of Fundamental Representations."[96]

"For a condition to effect a forfeiture, it must be unambiguous. If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one."[97] We read Section 9.3.2 of the Merger Agreement as unambiguously creating a condition precedent that provides for a forfeiture. The language that creates the condition precedent in the Merger Agreement reads: "[Sonova] shall have no right to recover any amounts pursuant to Section 9.2 unless the Purchaser notifies the Members' Representative in writing of such Claim pursuant to Section 9.3 on or before the Survival Date."[98]

This language differs significantly from that in cases where Delaware courts have declined to find a condition precedent. In *Blue Cube Spinco LLC v. Dow Chemical Co.*, for example, the Superior Court declined to find a condition precedent in a notice provision

---

[96] App. to Opening Br. at A036 (Merger Agreement § 9.3(c)). There are no allegations that Sonova's claims fall into the excluded categories of "claims for Fraud, Pre-Closing Tax Liability and breaches of Fundamental Representations."

[97] *QC Holdings, Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018); *see also Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *11 (Del. Super. Aug. 31, 2023) ("Because of the risk of forfeiture, a provision must employ unambiguous language to qualify as a condition precedent.").

[98] App. to Opening Br. at A036 (Merger Agreement § 9.3.2(a)) (underlines in original). We read Section 9.3.2 to be included within Section 9.3 and note that Section 9.3.2 is indented within Section 9.3 in the Merger Agreement.

29

relating to an indemnification claim.[99]  There, the plaintiff had acquired business lines and

properties from the defendant through a merger vehicle.  One of the acquired properties

was a manufacturing facility in Germany.  The plaintiff sought to improve this facility's

site and applied for expansion permits from the German government.  However, the

plaintiff's application was denied due to a code violation attributable to the defendant.  The

plaintiff "fronted some consulting and reconstruction costs" and "turned to [the defendant]

for reimbursement and ongoing coverage, citing provisions in the parties' agreement that

purport to impose on [the defendant] a duty to indemnify 'any and all' losses generated by

the Code Violation."[100]  After the defendant refused the plaintiff's request for coverage, the

plaintiff filed a complaint with claims for breach of contract and declaratory judgment and

the defendant moved to dismiss.

The court determined that the code violation fell within the scope of the defendant's

indemnification duty and then turned to the defendant's argument that the notice provision

in the parties' agreement was a condition precedent to coverage.  The court observed that

"[t]o lodge an indemnification claim, the [plaintiff] must, under Section 4.06(a), provide

[the defendant] with (i) a 'prompt ... written notice' that (ii) describes 'in reasonable detail

the amount of Loss, if known' and (iii) identifies the 'provisions' in the Separation

Agreement on which the Company bases its claim (the 'Notice Provision')."[101]  The court

cited *Aveanna Healthcare* for the principle that "'a condition precedent must be expressed

---

[99] *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460 (Del. Super. Sept. 29, 2021).
[100] *Id.*
[101] *Id.* at *2.

30

clearly and unambiguously[,]'"[102] and concluded that "[t]he Notice Provision does not clearly express a condition precedent."[103] The court supported its conclusion by pointing to the lack of consequences for the plaintiff's failure to comply, with the court writing:

> Most notably, the Provision does not tie to its mandatory notice procedures any consequences for failing to lodge an indemnification notice properly. When a provision guised by a party as a condition precedent does not identify the way in which it can be enforced, it will not be recognized as a condition precedent. That is especially so where, as here, interpreting the provision as a condition precedent would cause a total forfeiture of a sophisticated indemnification scheme executed in connection with an acquisition of various chemically-sensitive and intellectual properties, and that would expose the buyer to an array of environmental liabilities.[104]

Sonova points to *Blue Cube* to argue that finding a forfeiture in the present case "would create a commercially irrational result."[105] It argues that Thompson's interpretation results in a "lopsided outcome" because "Sonova would be exposed to 'an array of … liabilities,' simply by neglecting to include, for example, some of the available written

---

[102] *Id.* at *10 (quoting *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021)).

[103] *Id.* at *11.

[104] *Id.* By contrast, Delaware courts have found conditions precedent when the agreement provided a consequence for noncompliance. In *Ewell v. Those Certain Underwriters of Lloyd's, London* the court found a condition precedent that may effect a forfeiture when the language was as follows: "You must ensure that visible and accessible fire extinguishers be placed on each level of the dwelling. Failure to comply with this condition will render this insurance null and void." *Ewell*, 2010 WL 3447570, at *1. This is consistent with the principle that "[i]f the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one." *QC Holdings, Inc.*, 2018 WL 4091721, at *7. *See also Nucor*, 2023 WL 6368316, at *11 (citing *Blue Cube*, 2021 WL 4453460, at *11) ("When a provision does not identify the consequences of a party's failure to perform, *i.e.* how the provision will be enforced, it does not qualify as a condition precedent.").

[105] Answering Br. at 30.

31

evidence supporting the claim at the time the notice was served and regardless of whether [Thompson] was prejudiced in any way."[106]

We note, however, that *Blue Cube* is distinguishable. In *Blue Cube*, the notice provision was "silent on a non-conforming notice's consequences."[107] As a result, the court declined to find a condition precedent that would effect a forfeiture.[108] It then determined that a no waiver provision confirmed this conclusion and that "the parties plainly did not intend for the Notice Provision to be a condition precedent to coverage."[109]

By contrast, the Final Sentence unambiguously expresses a condition precedent. This is in part because – unlike the notice provision in *Blue Cube* – the language in the Merger Agreement states a consequence for noncompliance and reads as follows:

> Any claim by a Purchaser Indemnified Party on account of Damages under this Article IX (a "**Claim**"), including those resulting from the assertion of a claim by any Person who is not a Party to this Agreement (a "**Third-Party Claim**"), will be asserted by giving the Members' Representative reasonably prompt written notice thereof, but in any event not later than 30 days after the Purchaser Indemnified Party becomes actually aware of such Claim, provided that no delay on the part of the Purchaser Indemnified Party in notifying the Members Representative will relieve the Merger Parties from any obligation under this Article IX, except to the extent such delay actually and materially prejudices the Merger Party. Such notice by the Purchaser Indemnified Party will describe the Claim in *reasonable detail*, will include the justification for the demand under this Agreement with *reasonable specificity*, will *include copies of all available material written evidence thereof*, and will *indicate the estimated amount*, if reasonably practicable, of Damages that has been or may be sustained by the Purchaser Indemnified Party. The Purchaser Indemnified Parties ***shall have no right to recover any***

---

[106] *Id.* (quoting *Blue Cube*, 2021 WL 4453460, at *11).

[107] *Blue Cube*, 2021 WL 4453460, at *2.

[108] *Id.* at *11 ("When a provision guised by a party as a condition precedent does not identify the way in which it can be enforced, it will not be recognized as a condition precedent.").

[109] *Id.*

***amounts pursuant to Section 9.2 unless the Purchaser notifies the Members' Representative in writing of such Claim pursuant to Section 9.3 on or before the Survival Date.***[110]

The Final Sentence defines the consequences of a noncompliant notice. Courts have observed that "it is the presence of conditional language that 'limits or modifies rights or duties' in a contract that determines whether a condition precedent has been created."[111] Here, the language "shall have no right to recover" serves to limit or modify Sonova's rights in the contract. Combining the "shall have no right to recover" language with the word "unless" further demonstrates that Section 9.3.2's language forms a condition precedent.[112] This language means that Sonova "shall have no right to recover" "unless"

---

[110] App. to Opening Br. at A036 (Merger Agreement § 9.3.2(a)) (italics and bold in Final Sentence added) (other bold and underlines in original).

[111] *Citizens Ins. Co. of Am. v. Assessment Sys. Corp.*, 2019 WL 4014955, at *7 (D. Minn. Aug. 26, 2019) (quoting *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996)); *see also Int'l Food Concepts, Inc. v. E. U.S. Agric. & Food Exp. Council Corp.*, 242 F.3d 282, 2000 WL 1659332, at *1 (9th Cir. Nov. 3, 2000) (TABLE) (comparing *Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1221 (Pa. Super. Ct. 1994)) ("This case is also readily distinguishable from other instances when Pennsylvania courts have found the plain language of a contract expressly to reflect the parties' intent to create a condition precedent. Unlike *Acme Markets*, the only case cited by the district court, no clearly conditional language was employed here.")

[112] Courts have generally held that "unless and until" creates a condition precedent, but courts have also written that "unless" alone constitutes the "unmistakable language of condition" even when examining the use of the language of "unless and until." *See Kortright Cap. P'rs LP v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 681 (S.D.N.Y. 2018) (citing *MHR Cap. P'rs LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009)) ("Although courts generally interpret doubtful language as a constructive condition rather than an express condition, § 5.2 is clothed in the 'unmistakable language of condition,' such as 'if,' 'unless,' or 'until.'"); *Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*, 936 F. Supp. 2d 475, 494 (D.N.J. 2013) (citing *MHR Cap. P'rs LP*, 912 N.E.2d at 47) ("New York courts recognize certain terms as indicating the presence of a condition precedent: 'if', 'unless', and 'until' are some of the terms that courts interpret as creating a condition."); *MHR Cap. P'rs LP*, 912 N.E.2d at 47 ("We have recognized that the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition[.]'"); *see also Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp. 2d 714, 734 (E.D. Mich. 2013) ("Although the inclusion of language such as 'unless' or 'on condition of' would not be dispositive of the issue, the absence of

it complies with the applicable notice requirements. This represents an unambiguous consequence for noncompliance. Therefore, we hold that the Final Sentence, by requiring that Sonova submit notice "pursuant to Section 9.3" creates a condition precedent that may trigger a forfeiture if Sonova does not submit notice "pursuant to Section 9.3[.]"

"'Pursuant to' is a restrictive phrase meaning in compliance or conformity with."[113]

"'Comply[ing]' means doing what is required."[114] Here, the Final Sentence requires notice

---

such language weighs against finding clear intent to create a condition precedent."). The leading definitions of "unless" in Webster's Dictionary also define "unless" as, in part, meaning "except on the condition that" and "without the accompanying circumstance or condition that[.]" *Unless*, Webster's Third New International Dictionary (2002). These cases and definitions convince us that the Merger Agreement's use of "unless" expresses a condition precedent in unambiguous language.

[113] *Sjunde AP-fonden v. Activision Blizzard, Inc.*, 2024 WL 863290, at *5 (Del. Ch. Feb. 29, 2024) (citing *Genuine Parts Co. v. Essendant, Inc.*, 2019 WL 4257160, at *6 (Del. Ch. Sept. 9, 2019); *Samuels Realty, Inc. v. Tecot Distrib.*, 1977 WL 184925, at *1 (Del. Super. Dec. 15, 1977); *Pursuant to*, Black's Law Dictionary (11th ed. 2019)).

[114] *Id.* (citing *Comply*, Black's Law Dictionary (11th ed. 2019)). Thompson explained its understanding of "pursuant to" in the following exchange at Oral Argument:

> The Court: Do you read "pursuant to" to mean "in compliance with" the notice requirements set forth above?
>
> Counsel: Yes, Your Honor, if I misunderstood your question, I apologize. We don't know how else that could be read. "Pursuant to" means "in accordance with" and if it doesn't mean you must follow what is says right above, then what is written above is meaningless which Delaware law says can't happen.

Oral Argument Video at 10:46–11:08, https://courts.delaware.gov/supreme/oralarguments.

When the Court asked about the "pursuant to" language, Sonova did not address the meaning of "pursuant to." Oral Argument Video 21:29−22:36, https://courts.delaware.gov/supreme/oralarguments. Instead, Sonova argued that "Section 9.3" in the Final Sentence does not include Section 9.3.2. Oral Argument Video at 21:53–22:10, https://courts.delaware.gov/supreme/oralarguments. Sonova argued that the parties could have mentioned Section 9.3.2 specifically and that their decision to only cite Section 9.3 means Section 9.3.2 is not included. Oral Argument Video at 22:10–36, https://courts.delaware.gov/supreme/oralarguments.

We reject this argument as both waived and meritless. It is waived because Sonova failed to fairly raise it below. And it is meritless because the structure of the Merger Agreement shows that

"pursuant to Section 9.3" and Section 9.3 includes the Notice Requirements. Therefore, we read the phrase "pursuant to Section 9.3" as unambiguously incorporating the Notice Requirements into the Final Sentence. Accordingly, because the Notice Requirements are incorporated into the Final Sentence, the consequence of Sonova's failure to comply with them may result in a forfeiture.

### D. Sonova's Noncompliance With the Notice Requirements Is Reasonably Conceivable on the Record

Sonova's Motion to Dismiss should be denied unless Thompson "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[115] Here, Thompson's allegations that Sonova failed to comply with the Notice Requirements are reasonably conceivable.

In particular, it is reasonably conceivable that Sonova failed to comply with the Specificity Requirement that Sonova "include copies of all available material written evidence" of its claim. The Complaint alleges that "although Sonova supposedly spent months 'investigat[ing] and analy[zing] these matters,' the Purported Claim Notice failed to include **any** materials or evidence supporting Sonova's claim -- let alone 'copies of *all available material* written evidence thereof' as required by Section 9.3.2(a)."[116] As Sonova confirmed at oral argument, it did not provide any written evidence with the Claim

---

Section 9.3.2 is an indented subsection located within Section 9.3. Further, the Final Sentence deals with notice procedures and Section 9.3.2 is the only part of Section 9.3 that addresses notice procedures.

[115] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[116] App. to Opening Br. at A023 (Compl. ¶ 29) (emphasis in original).

Notice beyond its own assertions in the Claim Notice itself.[117] This lack of written evidence establishes that it reasonably conceivable that Sonova did not "include copies of all available material written evidence."

Moreover, Thompson has alleged that Sonova did not comply with the Timing Requirement of Section 9.3.2. The Timing Requirement has two components: (i) "reasonably prompt written notice thereof, but in any event not later than 30 days after the Purchaser Indemnified Party becomes actually aware of such Claim," and (ii) the delay "actually and materially prejudices the Merger Party."[118]

Thompson adequately pleads both components to the extent sufficient to survive a motion to dismiss, alleging that as to the first component:

> Sonova had been aware of the facts underlying its supposed Claim since long before then -- as Sonova representatives confirmed in various communications with Alpaca's former CEO and CFO before the Merger Agreement closed in February 2022, as well as communications with a continuing employee of Sonova in January 2023 and May 2023.[119]

Thompson pleads the following regarding the second component:

---

[117] Sonova conceded at oral argument before this Court that "it is true that [Sonova] did not attach any documentation to [Sonova's] claim notice but there are practical reasons for that." Oral Argument Video at 22:36–44, https://courts.delaware.gov/supreme/oralarguments. Sonova went on to discuss these reasons as including the allegedly incomplete nature of the investigation, the information allegedly being privileged and/or work product, and the information allegedly including protected patient information. Oral Argument Video at 22:44–24:02, https://courts.delaware.gov/supreme/oralarguments. Similarly, before the Court of Chancery, Sonova's counsel acknowledged: "I would have to concede that not one piece of paper went along with the notice[.]" *Id.* at A244 (Transcript of Oral Argument at 50:9–10, *Thompson Street Capital P'rs, IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2024 WL 1251150 (Del. Ch. Mar. 5, 2024) (No. 2023-0922)).

[118] App. to Opening Br. at A036 (Merger Agreement § 9.3.2(a)).

[119] *Id.* at A021 (Compl. ¶ 24).

[B]y disregarding its claim deadline Sonova caused the kind of material prejudice that deadline was put in place to avoid, including by (a) increasing the risk of excess Damages by disregarding contractual and statutory refund/repayment periods; (b) negating the Parties' ability to negotiate with applicable third-party payors in good faith and in a timely manner where due credit would be given; and (c) potentially implicating a greater period of noncompliance in any final Damages.[120]

Drawing reasonable inferences in favor of Thompson, as the Rule 12(b)(6) standard demands, it is reasonably conceivable that Sonova violated the timing provision.

E. *Whether the Forfeiture From Noncompliance With the Condition Precedent Can Be Excused Involves Questions of Materiality and Disproportionate Forfeiture That Are Insufficiently Developed in the Record*

Thus far, we have determined that: (i) the Final Sentence in Section 9.3.2 of the Merger Agreement – the governing agreement – creates a condition precedent that may effect a forfeiture as a result of Sonova's noncompliance with the Notice Requirements; and (ii) Sonova's noncompliance with the Notice Requirements is reasonably conceivable on the record. Next, we consider whether Sonova's reasonably conceivable noncompliance could be excused under the limited circumstances of disproportionate forfeiture. This, in turn, requires an analysis of the legally embedded issues of materiality and disproportionality.

Courts may excuse a condition precedent in cases where a party demonstrates that the condition precedent was not a material part of the agreement and satisfies the requirements for disproportionate forfeiture.[121] The Restatement (Second) of Contracts

---

[120] *Id.* at A022 (Compl. ¶ 25).

[121] Restatement (Second) of Contracts § 229.

provides that "[t]o the extent that the non-occurrence of a condition would cause *disproportionate forfeiture*, a court may excuse the non-occurrence of that condition unless its occurrence was a *material* part of the agreed exchange."[122]  This rule is "a flexible one, and its application is within the sound discretion of the court."[123]

### 1. Cases Analyzing Materiality and Disproportionate Forfeiture

Depending on the circumstances, the issues of materiality and disproportionate forfeiture could be decided as either a question of fact or law.  In *Aeolus Down, Inc. v. Credit Suisse International*, the United States District Court for the Southern District of New York denied the defendant's motion to dismiss a breach of contract claim after concluding that the materiality of the timing requirement at issue posed a question of fact.[124]  The parties had "entered into the Master Agreement and two confirmations giving [the plaintiff] the right to sell up to $2.3 million of its claims in the event of a May 2008 [third party's] bankruptcy."[125]  The Master Agreement provided that the defendant would have no further obligations to the plaintiff if the plaintiff did not execute an assignment agreement within 25 days after the bankrupt third-party filed its first schedule.  The plaintiff

---

[122] Restatement (Second) of Contracts § 229 (emphasis added); *see also id.* cmt.c ("The rule of [Section 229] applies only where occurrence of the condition was not a material part of the agreed exchange.").

[123] Restatement (Second) of Contracts § 229 cmt.b.

[124] *Aeolus Down, Inc. v. Credit Suisse Int'l*, 2011 WL 5570062, at *3 (S.D.N.Y. Nov. 16, 2011) ("Thus, unlike a typical option contract, both the benefit to Aeolus and Credit Suisse's exposure were determined before the 25–day period began to accrue.  Whether it was material to the bargain therefore poses a question of fact.").

[125] *Id.* at *1.

sought to exercise its right to sell the claims and the defendant refused on the grounds that the 25–day period for timely execution of the assignment agreement had passed.

The plaintiff brought actions for breach of contract, tortious breach of insurance contract, and declaratory relief alleging that the defendant owed $2.3 million under the agreement. The defendant argued that the plaintiff could not plead adequate performance because it failed to execute an assignment agreement.

The court determined that the parties employed the unmistakable language of condition and held that this created an express condition precedent. Specifically, the court found that execution of an assignment agreement within 25 days of the third-party's initial filing of its schedule was an express condition precedent of the defendant's obligation to purchase the claims. The court then observed that "[a]n express condition must be literally performed, unless it is excused by waiver, breach or forfeiture."[126]

The court quoted Restatement (Second) of Contracts Section 229 for the principle that "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the nonoccurrence of that condition unless its occurrence was a material part of the agreed exchange."[127] Applying this principle, the court concluded that the defendant "face[d] forfeiture: it paid $651,500 on the expectation that it would receive an indemnity of over two million dollars if [the third-party] went bankrupt."[128]

---

[126] *Id.* (internal quotation omitted).

[127] *Id.* at *3 (quoting Restatement (Second) of Contracts § 229).

[128] *Id.*

Moving on to materiality, the court held that "[t]he facts support a plausible inference that the 25–day period was not a material part of the agreed exchange."[129] The court pointed to the lack of a "time is of the essence" clause and the lack of evidence that a delay would prejudice the defendant.[130] The court also rejected the defendant's argument "that the 25–day period was material as a matter of law because the agreements at issue are option contracts[.]"[131] The court observed that "[u]nder the facts alleged, the purpose of the agreements was not to offer [the plaintiff] the choice of coverage if [the third-party] went bankrupt, but to cover it, unquestionably, once that event transpired."[132] Ultimately, the court concluded that "[w]hether it was material to the bargain therefore poses a question of fact."[133]

In *Acme Markets, Inc. v. Federal Armored Express, Inc.*, an inadequate record following a lower court's grant of summary judgment led the Superior Court of Pennsylvania to remand for consideration under Restatement (Second) of Contracts Section 229.[134] The court considered a provision in a contract providing that the carrier had to receive a bag or package and issue a receipt before it could be required to reimburse a customer for any losses. The court addressed the defendant carrier's obligation to issue a receipt to the plaintiff, which suffered a loss after the robbery of one of its cash bags

---

[129] *Id.*

[130] *Id.*

[131] *Aeolus*, 2011 WL 5570062, at *3.

[132] *Id.*

[133] *Id.*

[134] *Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1221–22 (Pa. Super. Ct. 1994).

accepted by the defendant carrier. The court determined that the contract's "plain language demonstrates that it clearly and unambiguously conditions [the defendant]'s performance under the contract upon both the acceptance of bags or packages and the granting of a receipt for them. Thus, it unquestionably delineates a condition precedent involving those requirements."[135]

Having "found that [the defendant]'s liability under the contract was subject to a condition precedent and neither party disputes that the receipt portion of the condition remained unfulfilled at the time of the robbery," the court considered "whether satisfaction of that requirement may be excused."[136] The court turned to the Restatement (Second) of Contracts Section 229 and quoted the language that "'[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.'"[137]

The court addressed the disproportionate-forfeiture requirement stating that "[t]here can be little doubt that the operation of the condition in question will lead to a forfeiture since the condition's nonoccurrence results in the denial of compensation for the loss of a cashbag possessed by [the defendant] for transportation in accordance with the contract.

---

[135] *Id.*

[136] *Id.*

[137] *Id.* (quoting Restatement (Second) of Contracts § 229 cmt.b).

Thus, the question becomes whether the forfeiture would be disproportionate."[138]  The

court quoted the following from Restatement (Second) of Contracts § 229:

> In determining whether the forfeiture is 'disproportionate,' [the] court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the nonoccurrence of the condition is excused to the extent required to prevent forfeiture.[139]

The court then noted, that although it believed "that the receipt requirement

probably was an accounting device which had little impact upon the situation presently at

issue, [the court's] examination of the certified record reveals that it is devoid

of *any* evidence demonstrating the requirement's actual purpose."[140]  The court observed

that "[i]n view of the inadequate record, [it] may not conduct the critical weighing analysis

required by the *Restatement* or determine whether fulfillment of the condition may be

excused."[141]  The court further "note[d] that the trial court erroneously believed that its

analysis ended upon concluding that a receipt was required to fulfill the condition

precedent[]" and that the trial court "did not consider whether the forfeiture would be

disproportionate, decide if the receipt requirement constituted a material part of the

exchange, or require the parties to provide an adequate record either for resolving those

issues or deciding whether summary judgment in favor of [the defendant] would be

---

[138] *Id.*

[139] *Id.* at 1221-22 (quoting Restatement (Second) of Contracts § 229 cmt.b).

[140] *Id.* at 1222 (emphasis in original).

[141] *Id.*

appropriate."[142] This led the court to reverse the trial court's grant of summary judgment and remand the matter for further proceedings.

The court further advised that "[o]n remand, the trial court should conduct an evidentiary hearing to determine the purpose of the receipt requirement and engage in the necessary weighing analysis. In addition, the court should determine whether the contested requirement constituted a material part of the agreement."[143] The court provided additional guidance stating that "[w]hile this determination rests to a large extent on the analysis of the requirement's purpose, it also involves a consideration of the negotiations of the parties along with all other circumstances relevant to the formation of the contract or to the requirement itself, including the circumstances surrounding the theft."[144]

Disproportionate forfeiture and materiality questions may be capable of being resolved as a matter of law depending on the nature of the conditions. For example, in *Obsidian Finance Group, LLC v. Identity Theft Guard Solutions, Inc.*, the Court of Chancery considered a Rule 12(b)(6) motion to dismiss and rejected the plaintiff's "argument that the Court may declare immaterial the six-month difference between the 5.5-year contract and the six-year earnout condition[.]"[145] The court observed that "an earnout provision contemplates the payout of additional, often substantial, consideration when the entity sold achieves specific, bargained-for milestones[]" and that "[t]he value of the

---

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Obsidian Fin. Grp., LLC v. Identify Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 (Del. Ch. Apr. 22, 2021).

contingent consideration is inextricably linked to the estimated probability of the contingent event's occurrence."[146]  This led the court to find that "[t]o change the benchmark of the earnout would be to change its risk profile and, by extension, the amount that should be paid in the event of its achievement."[147]  Finally, the court concluded that "[u]nlike horseshoes or hand grenades, there is no 'close enough' when it comes to earnouts negotiated by sophisticated parties based on the estimated probability that the *precise* measure would be hit.  Any adjustment to the earnout condition, then, would be 'material' as a matter of law."[148]  Here, we think some limited factual development is needed.

### 2. The Current Record is Inadequate to Determine Materiality or Disproportionate Forfeiture

We are unable on this record to resolve the materiality and disproportionate forfeiture questions.  We address materiality first because excusal of the condition, according to Section 229 of the Restatement, "applies only where occurrence of the condition was not a material part of the agreed exchange."[149]  Although, Thompson alleges that the timing and particularity requirements were material,[150] the record has not been

---

[146] *Id.*

[147] *Id.*

[148] *Id.*; *see also Citizens Ins. Co. of Amer. v. Assessment Sys. Corp.*, 2019 WL 4014955, at *5–7 (D. Minn. Aug. 26, 2019) (considering notice requirement in a claims-made insurance policy, finding that notice was of "integral nature" to the insurer, and "hold[ing] as a matter of law that the notice requirement in the Policy is a 'material'—indeed a 'basic' or foundational—term of the insurance agreement.").

[149] Restatement (Second) of Contracts § 229 cmt.c.

[150] Thompson alleges that "Sonova was well aware that these timing and particularity requirements were material provisions" and that by disregarding the claim deadline, Sonova caused material

44

developed on these points, including whether the parties, in negotiating these agreements, considered these requirements to be material.

Even if we were to determine that the Notice Requirements are not material, we are still unable to determine the disproportionate forfeiture issue on this record. Accordingly, we remand to the Court of Chancery for further consideration on these points.

### 3. Framework on Remand

To be as helpful as possible to the trial court on remand, we offer some guidance on the issues of materiality and disproportionate forfeiture. We think the Restatement's approach in Section 229 provides a useful roadmap. "Section 229 consists of two prongs: (1) whether the occurrence of the condition was a material part of the agreed exchange and (2) a proportionality analysis that balances the risk to be protected with the amount to be forfeited."[151] "Application of the second prong (proportionality) depends on whether the first prong (materiality) is met. In other words, if the occurrence of the condition is a material part of the agreement, then the proportionality analysis is not applied and the forfeiture cannot be prevented. But if the condition is not material, then the court is to engage in the proportionality analysis."[152]

---

prejudice, including by "(a) increasing the risk of excess Damages by disregarding contractual and statutory refund/repayment periods; (b) negating the Parties' ability to negotiate with applicable third-party payors in good faith and in a timely manner where due credit would be given; and (c) potentially implicating a greater period of noncompliance in any final Damages." App. to Opening Br. at A022 (Compl. ¶ 25).

[151] *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 29 (Minn. 2018) (citing Restatement (Second) of Contracts § 229 cmt.b, cmt.c). *See also* Restatement (Second) of Contracts § 229 cmt.c ("The rule of this Section applies only where occurrence of the condition was not a material part of the agreed exchange.").

[152] *Id.* (internal quotation omitted).

Regarding materiality, Restatement (Second) of Contracts Section 241 provides a list of factors that courts may consider. These factors, set forth earlier in this opinion, are:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[153]

Courts have also recognized that materiality in the context of Section 229 "rests to a large extent on the analysis of the requirement's purpose, [but] it also involves a consideration of the negotiations of the parties along with all other circumstances relevant to the formation of the contract or to the requirement itself[.]"[154]

If the trial court determines that the provision was not material, the court should turn to the proportionality prong of Section 229 to determine if the forfeiture was disproportionate.[155] The Restatement (Second) of Contracts Section 229 sets forth the following guidance regarding disproportionate forfeiture:

---

[153] Restatement (Second) of Contracts § 241.

[154] *See Acme Mkts.*, 648 A.2d at 1222.

[155] *See Capistrant*, 916 N.W.2d at 31 ("If the district court determines that the immediate return of property under the contract was not material, the district court then must turn to the proportionality prong of section 229 to determine if the forfeiture was disproportionate."); *see also Obsidian Fin. Group, LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 (Del. Ch. Apr. 22, 2021)

In determining whether the forfeiture is "disproportionate," [the] court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the nonoccurrence of the condition is excused to the extent required to prevent forfeiture.[156]

We leave to the Court of Chancery to determine what additional proceedings are needed to address the materiality, and if necessary, the disproportionate forfeiture issues.

F. *The No-Waiver Provision Does Not Prevent the Application of a Condition Precedent in This Case*

Next, we hold that the No-Waiver provision of the Merger Agreement does not prevent the release of the Indemnity Escrow Fund. As noted above, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[157] Further, our law requires that contracts "be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'"[158] In this case, applying the No-Waiver provision to prevent the release of the Indemnity Escrow Fund would negate

(considering materiality issue and concluding analysis after holding provision material, without examining disproportionate forfeiture).

[156] Restatement (Second) of Contracts § 229 cmt.b.

[157] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (citing *Katell v. Morgan Stanley Grp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993)); *see also TMIP Participants LLC v. DSW Grp. Holdings LLC*, 2016 WL 490257, at *12 (Del. Ch. Feb. 4, 2016) (Master's Report) ("[N]otwithstanding the parties' general agreement regarding the discretion afforded the Plan Administrator, they also expressly agreed to a specific procedure to challenge and arbitrate certain calculations over which the Plan Administrator was given discretion. That clear and specific arbitration provision trumps the general forum selection clause in the Merger Agreement, as well as the language giving the Plan Administrator broad discretion to make calculations.").

[158] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

the consequence of Sonova's failure to satisfy the condition precedent of compliance with the Notice Requirements.[159]

*Blue Cube*, upon which Sonova relies, is distinguishable. The *Blue Cube* court considered a no-waiver provision in the context of an alleged condition precedent; however, the *Blue Cube* court only considered the no-waiver provision *after* having determined that "[t]he Notice Provision does not clearly express a condition precedent."[160] This meant there was no specific provision to control over the general no-waiver provision. Therefore, we decline to read *Blue Cube* as suggesting that the general no-waiver provision should prevail over a clear, specific provision such as a condition precedent.

*Nucor* further supports our view that the no-waiver provision here does not override the condition precedent. The *Nucor* court examined three alleged conditions precedent – Section 9.07(b), Section 9.07(c), and the written notice provision in Section 9.07(a).[161] The court determined that the agreement stated consequences for failing to comply with Section 9.07(a), but the agreement "d[id] not tie the consequence of forfeiture to the requirements of 9.07(b) and (c)."[162] The court found that the no-waiver provision supported its conclusion that 9.07(b) and 9.07(c) were not conditions precedent; however, the court did

---

[159] We disagree with Sonova that this interpretation of the No Waiver provision would render it illusory. *See* Answering Br. at 33. Our holding has only construed the No Waiver provision in the context of the condition precedent set forth in Section 9.3.2.

[160] *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *11 (Del. Super. Sept. 29, 2021).

[161] *Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *12 (Del. Super. Aug. 31, 2023).

[162] *Id.*

not apply the no-waiver provision to override 9.07(a) – the provision the court had found stated consequences for noncompliance.[163]

In the present case, the Merger Agreement contains a condition precedent that states the consequence of forfeiture for noncompliance. Therefore, the condition precedent is more akin to Section 9.07(a) in *Nucor* where the court did not apply the no-waiver position. Thus, neither *Blue Cube* nor *Nucor* require us to deviate from the principle that the specific controls over the general defines the outcome in the present case.

### G. This Court Need Not Address the Dismissal of Count II – Specific Performance/Mandatory Injunction

Finally, Sonova does not explicitly mention Count II in its argument.[164] Because the parties do not ask that we separately address the dismissed of Count II, this Court will not address the issue.

---

[163] *Id.* ("Section 12.05 [the no-waiver provision] signals Section 9.07(b) and (c) were not intended to be conditions precedent resulting in forfeiture of indemnification."). Because the defendant had not asserted that Sections 9.07(b) and (c) were material, and because Section 9.01(g) only mentioned that failure to comply with Section 9.07(a) would result in a forfeiture, the court found that Sections 9.07(b) and (c) were not material. *Id.* at *14. Then, citing to Section 229 of the Restatement (Second) of Contracts, the court stated that the court could excuse the nonoccurence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreement. *Id.* It observed that even if Sections 9.07 (b) and (c) were conditions precedent, dismissal of the Count I claims would result in a disproportionate forfeiture. It viewed dismissal of over $5 million in damages on "technical grounds," *id.* at *13, as "fundamentally unfair." *Id.* at *14.

[164] Sonova mentions in the "Nature of Proceedings" section of its Answering Brief that "[Thompson's] Complaint does not plead the necessary elements of a claim for injunctive relief or specific performance." Answering Br. at 2.

## V. CONCLUSION

For the reasons set forth above, we **REVERSE** the Court of Chancery's order granting Sonova's Motion to Dismiss, and **REMAND** this action for further proceedings consistent with this Opinion.